UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

RENEE D. DROSS-SWART          )
                             )
          Plaintiff          )
                             )
     v.                      ) CIVIL NO. 2:11 cv 175
                             )
MICHAEL J. ASTRUE, Commissioner, )
Social Security Administration,  )
                             )
          Defendant          )

<u>OPINION AND ORDER</u>

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, Renee D. Dross-Swart, on May 18, 2011. For the reasons set forth below, the decision of the Commissioner is **REMANDED**.

<u>Background</u>

The claimant, Renee E. Dross-Swart, filed an application for Disability Insurance Benefits ("DIB") on May 10, 2007, alleging an onset date of February 20, 2006. (Tr. 15)  The claim was denied initially on July 25, 2007, and upon reconsideration on October 1, 2007.  (Tr. 15)  Dross-Swart filed a written request for a hearing on November 6, 2007.  (Tr. 15)  The hearing was held on May 21, 2009, in Gary, Indiana, before ALJ Denise D. Martin, who was presiding from Orland Park, Illinois via video-conference.  (Tr. 15)  The claimant and her husband, Michael

Swart, both testified at the hearing.  (Tr. 15)  Dr. Sheldon J. Sladke, M.D., an impartial medical expert, and Lee O. Knutson, an impartial vocational expert, also appeared and testified.  (Tr. 15-25)  On August 11, 2009, ALJ Martin issued a decision denying Dross-Swart's claim.  (Tr. 15-25)  The Appeals Council denied Dross-Swart's Request for Review on January 13, 2011.  (Tr. 2-4)  Dross-Swart requested additional time to file a civil action, which was granted.  (Tr. 1)  Subsequently, this action was filed on May 18, 2011.

Dross-Swart was born on November 12, 1967, and currently is 44 years old.  (Tr. 35, 166)  At the time of the hearing, she was 5'6" and weighed 195 pounds.  (Tr. 37)  Dross-Swart attended two years of college at Purdue University Calumet, and she completed the requirements to be a Licensed Practical Nurse at Olympia College in Merrillville.  (Tr. 36)  Dross-Swart's previous work experience included: unit director at a nursing home in Michigan City, medical surgical floor nurse at Illiana Medical, nurse at Highland Nursing Home, nurse at Dyer Nursing and Rehab, nurse at Regency in Dyer, student nurse at St. Mary's Hospital, department manager at Kohl's, waitress, and special education assistant for the School City of East Chicago. (Tr. 38-43)  Dross-Swart has not engaged in substantial gainful activity since February 20, 2006, the alleged onset date.  (Tr. 17)

2

On February 20, 2006, Dross-Swart was admitted to Community Hospital's Emergency Room after being struck by a car. (Tr. 244-248) A physical examination revealed contusions on her right hip, right knee, right and left shoulders, right and left elbows, and right foot, along with mild pain in the right and left shoulders, right hip, left elbow, right knee, and right foot. (Tr. 246-47) X-rays were all negative, and Dross-Swart denied falling on the ground. (Tr. 249-254, 488)  The emergency room also noted that there was no evidence of head trauma. (Tr. 246)  On February 22, 2006, Dross-Swart was treated by Dr. Martin Hall, who observed a right thigh contusion, right knee grade I medial collateral ligament strain, possible medial meniscus tear, and a lateral elbow contusion and inflammation. (Tr. 488)  Dr. Hall's plan called for Dross-Swart to take Aleve twice a day and ice the right knee and left elbow.  Dr. Hall allowed her to return to work the next day at Illiana Surgery Center and Hospital. (Tr. 488)

On February 26, 2006, Dross-Swart returned to the emergency room with complaints of a headache and post concussion syndrome. (Tr. 256) A physical examination reveled nausea, vomiting, and sensitivity to light. (Tr. 260)  A CT scan was unremarkable except for an indication of sphenoid sinus disease. (Tr. 263)

Dross-Swart reported that her symptoms were nearly resolved a couple hours after receiving medication. (Tr. 258)

On March 2, 2006, Dross-Swart followed up with Dr. Hall and complained of right knee bruising, her knee occasionally giving out, left elbow pain, and tenderness at the lateral epicondyle. (Tr. 486) Dr. Hall noted that Dross-Swart was unable to take Aleve because it upset her stomach. He prescribed Daypro and instructed her to ice her elbow twice a day at the end of the day when she got home. Dr. Hall noted that Dross-Swart was working regular duty. (Tr. 486)

On March 16, 2006, Dross-Swart followed up with Dr. Hall. (Tr. 485) She complained of her right knee occasionally giving out, had a marked McMurray's medial joint line tenderness and moderate patellofemoral crepitations, negative anterior drawer, and negative Lachman of the right knee. (Tr. 485) Dr. Hall noted that Dross-Swart had full range of motion in her left elbow but that she still had lateral epicondyle pain and some anterior pain with radicular symptoms along the median nerve distribution of the hand. (Tr. 485)

On May 5, 2006, Dross-Swart was examined at Retina Associ- ates. (Tr. 273) She was found to have possible traumatic optic neuropathy. (Tr. 273) A letter from Dr. Christopher Pelzek of Retina Associates noted that Dross-Swart was suffering from a

4

lack of depth perception due to some peripheral field loss and occasional pulsation of images in the left eye.  (Tr. 276)  Dr. Pelzek noted the limited nature of neuropathy given the lack of any clear afferent pupillary defect.  (Tr. 276)

From May 30 to June 3, 2006, Dross-Swart was treated for a two-week history of increasing constant headaches associated with palpitations, dizziness, and near syncopal episodes.  (Tr. 289) She also complained of increasing weakness involving both her left arm and her right leg which began when she was in the vehicular accident.  Dross-Swart denied any history of syncope, seizures, or loss of consciousness.  She had significant visual disturbances involving her left eye with significant vision loss due to traumatic optic neuritis and nerve damage.  (Tr. 289) Dross-Swart also reported a history of having frequent episodes of retrosternal chest tightness, shortness of breath, and wheez-ing at rest, which started about three to five days prior to admission.  An MRI of the head and cervical spine did show arthritic changes without any herniated cervical disc.  (Tr. 289) Dross-Swart was diagnosed with a severe headache to post contu-sion syndrome, cervical spondylosis with cervical radiculopathy, left shoulder impingement with supraspinatus tendonitis, and subluxing extensor tendon of the left elbow causing clicking. (Tr. 290)

On May 31, 2006, Dross-Swart was treated by Dr. Kishan Chand. (Tr. 300) Dross-Swart described pain in her neck, left shoulder, left elbow, and left hand with numbness in the little finger and ring finger. Her left shoulder was tender over the biceps tendon, her elbow showed clicking of the common extensor tendon with pain, and her hand showed some wasting of the thenar eminence. Dross-Swart also had numbness in the hand and in the whole of the left upper extremity including the forehead and chest area. (Tr. 300) Also on May 31, 2006, in a consultation with Dr. Amarjit S. Bhasin, Dross-Swart had post concussive headaches, post traumatic vascular headaches, numbness of the left arm, post traumatic cervical strain, and questionable history of post traumatic optic neuropathy. (Tr. 303)

On July 7, 2006, Dross-Swart attended an appointment at Illiana Rehabilitation Services and complained of shoulder pain being a three to four on a scale of ten, spasms and tenderness, a range of motion that was 45 degrees for cervical flexion, 30 degrees for extension, 52 and 55 degrees for left and right rotation respectively, and 35 to 30 degrees for left and right side bending, respectively. (Tr. 334)

On September 2, 2006, Dross-Swart was admitted to the Community Hospital Emergency Room complaining of acute vascular headaches. (Tr. 349) She had a migraine that had started a day

and a half before she was admitted and had vomited four times before going to the hospital.  Dross-Swart stated that her eyes were crossing and that they were sensitive to light.  (Tr. 349)  She was admitted to the emergency room again on December 11, 2006, complaining of migraine headaches and chest pressure.  (Tr. 357)

On December 30, 2006, Dross-Swart went to the Community Hospital Emergency Room for head, chest, and leg pain.  (Tr. 363)  She stated that the symptoms had been chronic since the February 2006 car accident.  (Tr. 362)  A physical examination revealed power loss in her left leg, tingling sensations in her left arm and leg, a 105 degree fever, and muscle aches.  (Tr. 364)  On December 31, 2006, Dross-Swart underwent a CT scan of her sinus cavity, which revealed mild bilateral ethmoid and right maxillary sinus disease and a nasal septal deviation to the left.  (Tr. 372)  A CT scan of her cervical spine revealed a degenerative disk disease with mild narrowing of the neural foramina at C5-C6. (Tr. 374)

On January 2, 2007, Dross-Swart had a CT scan of her abdomen.  (Tr. 417)  The results showed her gallbladder wall had thickened, a small amount of fluid near the tip of the liver, and an area of low attenuation noted centrally within the left kidney with inflammation.  (Tr. 417)  On January 3, 2007, she had an

7

ultrasound of her kidney which revealed mild dilatation of the right renal collecting system with free fluid in the abdomen. (Tr. 376)  Dross-Swart also had an ultrasound of her gallbladder, which revealed gallstones with thickening of the gallbladder wall and pericholecystic fluid present.  (Tr. 377)

On April 13, 2007, Dross-Swart was treated at the Marcotte Medical Group by Dr. Robert Kovachevich, D.O.  (Tr. 421-424) Dross-Swart noted that her left arm and neck were swollen and that she had migraine headaches.  (Tr. 421)  At this time, she was working with no restrictions.  (Tr. 421)  In a letter dated April 20, 2007, Dr. Kovachevich cleared her to perform any required duties that her job assignment demanded.  (Tr. 422)  In subsequent visits to the Marcotte Medical Group on May 24, 2007 and June 21, 2007, Dross-Swart noted that she still was having bad headaches, left arm pain, trouble sleeping, bad vision, and that she wanted her neck adjusted.  The forms indicated that her present work status on those dates was "off."  (Tr. 419-20)

On July 13, 2007, Dross-Swart was referred to Mid-America Psychological & Counseling Services by the Social Security Administration for a mental status examination and memory assessment.  (Tr. 426)  She appeared well groomed, her personal hygiene was adequate, no hearing impairment was present, she was cooperative and adequately motivated, she displayed good social skills

8

and etiquette, her speech and language functions were unimpaired, and she appeared somewhat tired.  (Tr. 427)  She was oriented to time, place, and person, her mood was dysthymic and somewhat anxious, and she reported that she could not handle noise.  (Tr. 428)  Her speech was clear, relevant, and goal oriented, and she reported no negative effects with medication.  Unusual, inappropriate, or delusional thought content was not noted.  (Tr. 428)  Dross-Swart's memory functions were assessed with the Weschler Memory Scale-III.  Her memory functions as assessed indicated superior memory functions, her immediate memory recall was in the high average range (Index Score: 117), her auditory delayed and auditory recognition memory was in the superior range (Index Score: 130), and her working memory was in the average range (Index Score: 105).  Diagnostic impressions indicated a GAF of 55.[1]  (Tr. 429)

On the same date, Dr. B. Saaverda of the Institute of Family Health completed an evaluation of her impairments.  (Tr. 435-439)  Dr. Saaverda noted weight gain and poor appetite, no chest pain or shortness of breath on exertion, no history of convulsions within the nervous system, but weakness, dizziness, and poor

---

[1]   The GAF scale measures a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnosis and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV-TR). The established procedures require a mental health professional to assess an individual's current level of symptom severity and current level of functioning, and adopt the lower of the two scores as the final score. *Id.* at 32—33. A GAF score ranging from 51—60 indicates moderate symptoms.  *Id.*

balance.  (Tr. 436)  The physical examination showed that Dross-Swart was appropriately dressed, there was no evidence of personal hygiene neglect, and she was alert and oriented.  (Tr. 436)  The remainder of the physical exam was unremarkable as Dross-Swart showed full range of motion in all upper extremities, strength of 5/5 in all major muscle groups, and normal biceps, triceps, and brachioradialis reflexes.  (Tr. 437)  She had a normal gait, was able to stoop and squat without difficulty, and was able to get on and off the examination table without difficulty.  (Tr. 438)  Dr. Saaverda's impressions found Dross-Swart suffering from migraines, tension headaches, and cervical spondylosis.  (Tr. 439)

On July 23, 2007, a psychiatric review technique was completed by a non-examining State agency review.  (Tr. 441-454)  Joseph A. Pressner, Ph.D., concluded that Dross-Swart did not have a severe mental impairment.  (Tr. 441) Dr. Pressner indicated that Dross-Swart suffered from Major Depressive Disorder and an Adjustment Disorder with mixed anxiety and depression.  (Tr. 444) Dr. Pressner also found that Dross-Swart had mild limitations in activities of daily living, maintaining social function, and maintaining concentration, persistence, or pace.  There were no episodes of decompensation.  (Tr. 451) On September 19, 2007, Donna Unversaw, Ph.D., reviewed all of the evidence in

10

the file and Dr. Pressner's July 23, 2007 psychiatric review technique.  Dr. Unversaw affirmed Dr. Pressner's assessment. (Tr. 468)

On July 24, 2007, a Physical Residual Functional Capacity ("RFC") Assessment was completed by State Agency, non-examining reviewer Dr. Fernando R. Montoya.  (Tr. 455-462)  Dr. Montoya found that Dross-Swart could lift 50 pounds occasionally, lift 25 pounds frequently, stand and/or walk about six hours in an eight-hour workday, and sit for a total of six hours in an eight-hour workday.  (Tr. 456)  Dr. Montoya found that Dross-Swart should avoid moderate exposure to noise because of migraines, avoid concentrated exposures to hazards (machinery, heights, etc.), and avoid more than frequent exposure to very bright lights.  (Tr. 459)  Dr. Montoya concluded that Dross-Swart's allegations regarding the nature and severity of the impairment-related symptoms and functional limitations were partially credible. (Tr. 460)  The allegations regarding the symptoms were found to be supported by medical evidence in the file, but the contentions regarding severity of, and the related functional restrictions, were not supported.  (Tr. 460)  On September 22, 2007, Dr. M. Ruiz reviewed all the evidence in the file and Dr. Montoya's assessment of July 24, 2007.  (Tr. 469)  Dr. Ruiz affirmed Dr. Montoya's assessment.  (Tr. 469)

11

On August 27, 2007, Dross-Swart was treated at the Marcotte
Medical Group.  (Tr. 464)  She complained of nausea, headaches,
sleeping problems, left eye vision problems, and dizziness.  (Tr.
464)  On January 16, 2008, Dross-Swart went to Marcotte Medical
Group for headaches.  (Tr. 482)  On February 5, 2008, Dr.
Kovachevich reported that Dross-Swart had headaches due to
traumatic cervical strain and muscle tension and that she suf-
fered from falls, weakness on the left, and vertigo.  (Tr. 470)
Dross-Swart still was suffering from recurring migraines, vision
problems, nausea, and increased sensitivity to light on March 28,
2008.  (Tr. 481)  She complained of migraines and bad vision on
July 22, 2008.  (Tr. 480)  On November 26, 2008, Dross-Swart
stated that her medication was not working and that she would
like to go back to her old medication.  (Tr. 484)

At the hearing before the ALJ, Dross-Swart testified that
after her accident, she was taken to the emergency room and was
given a CT scan, x-rays, and a physical exam.  (Tr. 44)  She
testified that she did not have surgery.  Since the accident, she
has had physical therapy, osteopathic treatment, and was pre-
scribed medication.  She testified that she had pain all of the
time in her neck and down her left arm.  (Tr. 44)  Dross-Swart
described her constant headaches and her intolerance of noise.
(Tr. 45)  She testified that she took several medications includ-

12

ing:  Vicodin and Ultram for headaches, Micardis for high blood
pressure, Ambien for sleeping problems, Wellbutrin for Bipolar
disorder, Neurontin for nerve damage, and Motrin with Tramadol.
(Tr. 45-47)  She testified that the medications helped her relax.
(Tr. 47)

Further, Dross-Swart testified that she usually got head-
aches twice a week that lasted for a day.  (Tr. 48)  She usually
got a total of eight hours of sleep per day including naps.  (Tr.
50)  Dross-Swart stated that her left arm was basically useless
and that she had trouble holding things in her left hand because
she tended to drop them.  (Tr. 50)  She also testified that she
would fall down and walk into things because she could not see
out of the corner of her left eye due to the neuropathy.  (Tr.
51)

Dross-Swart testified that she was diagnosed with Bipolar
disorder about a year before her accident and that it had gotten
considerably worse since the accident.  (Tr. 52)  Also, she
stated that most of the medications that seemed to work for her
were a few hundred dollars per month and were too expensive.
(Tr. 52)  She described the pain in the back of her head, neck,
and left arm at a four on a scale of one to ten.  (Tr. 54)  The
pain in her neck could go up to an eight or nine.  (Tr. 55)  At

13

the worst, her headaches were a ten on a scale of one to ten. (Tr. 55)

Dross-Swart testified that she had three children and that they all lived at home with her. (Tr. 36-37) She stated that she was right-handed and that it was her non-dominant hand that was affected. (Tr. 37) At the time of the hearing, she weighed 195 pounds, but at the time of the accident, she weighed 126 pounds. Dross-Swart attributed her weight gain to depression and medication. Further, she testified that she had been receiving medication for depression and that she had been diagnosed with bipolar disorder. (Tr. 37)

Dross-Swart described her last job as unit director at a nursing home in Michigan City. (Tr. 38) She testified that she was suspended after three months because she was not able to keep up with paperwork and was getting too much overtime. (Tr. 39) After five months she was terminated. Prior to that she testi-fied that she was a medical-surgical floor nurse at Illiana Medical for a year and a half. She described her duties as total patient care from lifting patients and equipment to being on her feet most of the day. (Tr. 39-40) She described similar previ-ous jobs and duties in the nursing field. (Tr. 40-41) Prior to her nursing experience, she was a department manager at Kohl's where her duties included maintaining inventory, setting up

displays, staffing, and assisting with customer service.  (Tr. 42)  Prior to that, she was a cocktail waitress and a special education assistant for the School City of East Chicago.  (Tr. 42-43) As a special education assistant, she worked one-on-one with an autistic girl.  Dross-Swart's duties included lifting the girl, taking her to and from the bathroom, and taking her outside to calm her down.  She testified that it was "very physical with her."  (Tr. 43)

A typical day for Dross-Swart consisted of getting up at 7:00 a.m. to get her daughter off to school.  She took a nap from about 9:00 a.m. to 11:00 a.m.  (Tr. 56)  She did not do much housework because she knocked things off the counter.  (Tr. 57) Dross-Swart watched her grandson while her daughter vacuumed. When her youngest daughter got home from school, Dross-Swart helped her with her homework and made dinner.  (Tr. 57)  Dross-Swart drove to her mother's house twice per week.  (Tr. 57)  She only drove with someone else in the car because there were many times when she had to pull over and let someone else drive. Dross-Swart could fold laundry but could not carry it up stairs because of pain in her left arm.  (Tr. 58)

Dr. Sheldon Sladke, who is licensed to practice medicine in Illinois and is board certified in internal medicine, testified at the hearing as a medical expert ("ME").  (Tr. 60)  Dr. Sladke

15

reviewed the records and determined that Dross-Swart had the following conditions: headache, post-concussion, traumatic neuro-pathy with some scotoma and visual field defect, dizziness, possible vestibular, memory loss, gallstones, chronic sinusitis, neck pain, and obesity.  (Tr. 61-62)  Dr. Sladke noted that an eye exam done on May 5, 2006, was normal.  (Tr. 61) He also agreed with the RFC assessment done by Dr. Montoya on July 24, 2007.  (Tr. 63)  When questioned by Dross-Swart's attorney whether a person with headaches similar to those described by Dross-Swart could work, the ME answered, "I guess not."  He did not find any indication in the record that the headaches were not real and found that the medicines that Dross-Swart was taking were the appropriate medications for the headaches.  (Tr. 64)

Dross-Swart's husband, Michael Swart, testified.  (Tr. 65) He stated that they married on December 14, 2007, which was after the accident.  (Tr. 66)  Swart testified that Dross-Swart was unable to do much around the house.  She had constant headaches that would keep her in bed for two days.  (Tr. 66)  Dross-Swart writhed in pain when she had headaches.  (Tr. 67)  Swart testi-fied that Dross-Swart had problems with dropping things and running into things.  He further testified that Dross-Swart could dust and do light housework and that he tried to help out with the housework and their kids.  (Tr. 68)  Swart stated that three

16

hours of straight sleep was good for Dross-Swart and that the family tried to keep the house as dark as possible. (Tr. 69) Swart testified that Dross-Swart spent 15 to 18 hours lying in their dark bedroom when her headaches were bad. (Tr. 70)

Lee Knudsen, a Vocational Expert ("VE"), was last to testify at the hearing. (Tr. 70) The ALJ posed a series of hypothetical questions. First, the ALJ asked whether a person of Dross-Swart's age, education, and work experience, who was limited to light work, must avoid concentrated exposure to heights and dangerous moving machine, must avoid moderate exposure to noise, and must avoid more than frequent exposure to very bright lights, would be capable of doing any of Dross-Swart's past work. (Tr. 72) The VE responded that Dross-Swart could perform her previous job as a waitress and a teacher's aide. The ALJ then asked whether a person with the above description could perform any other jobs. The VE responded that there were unskilled jobs from the light category in the Chicago metropolitan area and Lake and Porter Counties. He reported that there were approximately 17,200 light, unskilled assemblers, 35,000 light, unskilled cashiers, and 8,600 light information clerks. The ALJ then modified the hypothetical and asked whether the VE's response would change if Dross-Swart only could have occasional exposure

17

to very bright light.  The VE stated that the modification would not change his answer.  (Tr. 72)

Dross-Swart's attorney used the ALJ's first hypothetical and asked whether it would make a difference if that person was limited in the use of their non-dominant hand.  The VE responded that Dross-Swart would not be able to be a waitress, hold a cashier position, or do any of the production jobs previously listed but that she still could do her previous job of teacher's aid and information clerk.  The hypothetical further was modified to a person with headaches so severe that the person would cry and have to be in a dark room twice a day for the entire day. (Tr. 73)  The VE responded that the modification would eliminate any of the jobs mentioned because that person would be absent too much.  (Tr. 74)  The ALJ followed up with the VE by asking him whether the limitations given by Dross-Swart's attorney would be consistent with occasional handling and fingering with the left upper extremity.  (Tr. 75)  The VE responded that the limitation would eliminate jobs with frequent or continuous use of both hands, such as the cashier jobs, production jobs, and waitress jobs.  (Tr. 75-76)  The VE reaffirmed that the teacher's aid and information clerk jobs would still be available.  Also, the VE stated that a person with those limitations could do a parking lot attendant job (2,000 available) at the light area.  (Tr. 76)

18

In her decision, the ALJ discussed the five-step sequential
evaluation process for determining whether an individual is
disabled.  At step one, the ALJ found that Dross-Swart had not
engaged in substantial gainful activity since February 20, 2006,
her alleged onset date.  (Tr. 17)  At step two, the ALJ found
that Dross-Swart had the following severe impairments: headache
and neck pain secondary to motor vehicle accident, possible optic
neuropathy, history of gallstones, chronic sinusitis, and obe-
sity.  (Tr. 17)  At step three, the ALJ found that Dross-Swart
did not have an impairment or combination of impairments that met
or medically equaled one of the listed impairments.  Specifi-
cally, the ALJ stated that the ME, Dr. Sladke, considered Listing
1.02 (major dysfunction of a joint(s) due to any cause), Listing
1.04 (disorders of the spine), and Listing 2.07 (disturbance of
labyrinthine-vestibular function), and concluded that Dross-
Swart's impairments did not meet the level of severity of these
Listings.  (Tr. 19)  The ALJ also stated that, although migraine
headaches and obesity were not specifically identified in the
Listings, these impairments also were considered in combination
together and in combination with all of the other identified
impairments.  (Tr. 19)

In determining Dross-Swart's RFC, the ALJ stated that she
considered the entire record and found that Dross-Swart had the

capacity to perform light work; she occasionally could use her left hand and arm; she must avoid concentrated exposure to heights and moving machinery; avoid moderate exposure to noise; and avoid more than frequent exposure to very bright lights. (Tr. 19)  In reaching this determination, the ALJ first observed that Dross-Swart experienced chronic and severe pain and took medications frequently throughout the day and night.  (Tr. 20) She stopped working as a nurse on February 20, 2006, and tried to continue working in various aspects of nursing, but an inability to focus and concentrate as well as continuous pain and headaches were exacerbated by noise and doing physical demands of nursing. Dross-Swart reported that her abilities varied depending on her headaches and how much sleep she got the night before.  She could cook, do laundry, go grocery shopping, drive, and clean house with breaks and limited use of the left arm.  Blurred vision affected Dross-Swart's ability to read or watch television, and she could not attend large events due to sensitivity to noise. (Tr. 20)  The ALJ noted her current medications as Micardis for hypertension; Vicodin, Tramadol, and over-the-counter Ibuprofen for pain; Ambien for insomnia and pain; Wellbutrin for Bipolar disorder, anxiety, and depression; Nuerontin for pain, anxiety, and depression; and over-the-counter Senna for constipation. (Tr. 20)

The ALJ discussed Dross-Swart's alleged disability date of February 20, 2006, when Dross-Swart was struck by a car while walking in a parking lot. (Tr. 20) She sought emergency room treatment for numerous contusions, but x-rays taken at the time were described as normal. Later, a CT scan of the brain was unremarkable and noted sphenoid sinus disease. She was discharged with a diagnosis of post-concussion syndrome. After the accident, Dross-Swart received treatment from Dr. Martin Hall for right thigh pain, right knee pain, and left elbow pain. The x-rays did not show any fractures. Dross-Swart later reported her knee occasionally "giving out." (Tr. 20) On May 5, 2006, Dross-Swart consulted with an ophthalmologist for visual related problems, but there was no evidence of any anterior segment or retinal pathology and no treatable intraocular disease. (Tr. 20-21) Dross-Swart was hospitalized from May 30 to June 3, 2006. (Tr. 21) While hospitalized, Dross-Swart consulted with an orthopedic physician, Dr. Chand, and a neurologist, Dr. Bhasin. Diagnostic and evaluative tests resulted in minimal clinical findings. Discharge diagnoses were noted as follows: severe headache due to post contusion syndrome, cervical spondylosis with cervical radiculopathy, left shoulder impingement with supraspinatus tendonitis, and subluxing extensor tendon of the left elbow causing clicking. (Tr. 21) There were several

emergency room visits for treatment for pain associated with migraines.  On December 31, 2006, she returned to the emergency room, and a CT scan of the head showed mild bilateral ethmoid and right maxillary sinus disease and nasal septal deviation to the left but were described as normal with regard to the brain.  A CT scan also showed degenerative disk disease with mild narrowing of the neural foramina at C5-C6.  Chest x-rays were negative and ultrasounds noted mild dilation of the right renal collecting system, free fluid in the abdomen, and that gallstones were a concern.  Dross-Swart had gallbladder surgery on January 4, 2007. (Tr. 21)

The ALJ noted that there was very little in the record in terms of any regular medical treatment.  Dr. Robert Kovachevich provided adjustments and osteopathic manipulative breathing treatments.  (Tr. 21)  Dross-Swart was evaluated by examiners at the direction of the Bureau of Disability Determination Services. (Tr. 22)  Clinical psychologists Kalyani Gopal, Ph.D. and Harry Gunn, Ph.D., diagnosed Dross-Swart with Major Depressive Disorder and Adjustment Disorder with Mixed Anxiety and Depression with a GAF of 55. The neurological examination essentially was normal. (Tr. 22)

After considering the evidence, the ALJ stated that Dross-Swart's medically determinable impairments reasonably could be

22

expected to cause the alleged symptoms, however, Dross-Swart's statements concerning intensity, persistence, and limiting effects were not credible to the extent they were inconsistent with the RFC assessment.  Dross-Swart received a course of medical treatment best described as conservative, which remained essentially unchanged.  (Tr. 22)  CT scans of the head and brain essentially showed sinus problems, and x-rays were consistently described as negative.  The most significant finding in the record relating to the degenerative changes in the cervical spine included descriptive terms such as "mild" or "moderate." (Tr. 23)  The ALJ explained that one would expect significant diagnostic findings and other indications that more aggressive treatment options were considered beyond the limited physical therapy in 2006 and the equally limited osteopathic adjustments. There would be evidence of follow-ups recommended by consulting physicians and evidence indicating attempts to establish a clinical or diagnostic basis for Dross-Swart's alarming symptoms. (Tr. 23)  The ALJ considered the testimony of Dross-Swart's husband and reports provided by Dross-Swart's mother, which supported Dross-Swart's allegations, but those reports did not outweigh the other, more probative, medical evidence that was considered.  The ALJ noted that Dross-Swart alleged an inability

to hold objects, but she had normal strength and motor examinations.  (Tr. 23)

The ALJ relied on the opinion and testimony of Dr. Sladke, who testified at the hearing and concluded that the state agency opinion, which established a medium RFC, was appropriate.  (Tr. 24) Significant weight was given to the Dr. Sladke and state agency opinions because the record did not contain any opinions from treating or examining physicians indicating that Dross-Swart was disabled or even had limitations greater than those determined in the ALJ's decision.  (Tr. 24) On April 20, 2007, Dross-Swart's primary care physician, Dr. Kovachevich indicated that Dross-Swart was cleared to perform any required duties her job assignment demanded.  On February 5, 2008, Dr. Kovachevich noted that Dross-Swart did not have migraines but had headaches due to traumatic cervical strain and not muscle tension.  The ALJ opined that these statements did not suggest anything supportive of a finding of total disability.  (Tr. 24)

With the RFC determined, at step four the ALJ found that Dross-Swart was capable of performing past relevant work as a teacher's aid.  (Tr. 25)  At step five, the ALJ found that considering Dross-Swart's age, education, work experience, and RFC, there were jobs available in the national and regional

24

economy that she could perform, including parking lot attendant (2,000 jobs) and information clerk (8,600 jobs).  (Tr. 25)

<u>Discussion</u>

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852 (1972)(*quoting* *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot

25

stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable

> to engage in any substantial gainful activity by reason of any medically determinable phys- ical or mental impairment which can be ex- pected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

> 42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen- tial evaluation to be followed when determining whether a claim- ant has met the burden of establishing disability. 20 C.F.R. §404.1520. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b). If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combi- nation of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regula- tions. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be

conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of her past work.  If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled.  20 C.F.R. §404.1520(e).  However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Dross-Swart raises four arguments for reversing and remanding the ALJ's decision: first, that the ALJ did not evaluate properly whether her mental impairments were severe; second, that the ALJ made an improper Step 3 determination; third, that the ALJ made an improper credibility determination; and fourth, that the ALJ made incorrect Step 4 and 5 determinations.

First, Dross-Swart argues that the ALJ erroneously dismissed her mental limitations as not being severe or having an impact on her ability to perform work because she did not make the proper evaluation under 20 C.F.R. §404.1520a(e).  Section 12.00(A) of

27

the Social Security Regulations describes the structure of the
Mental Disorder Listings.  To show that she meets the Mental
Disorder Listing, the claimant must submit a set of medical
findings that support a diagnosis of one of the listed medical
impairments.  After the claimant has met this burden, the ALJ
must assess the severity of the impairment under Paragraph B.  20
C.F.R. §404.1520a(a).  Paragraph B sets forth the impairment-
related functional limitations that are incompatible with the
ability to do any gainful activity.

The claimant's functional limitations are assessed by using
the four criteria set forth in Paragraph B of the listings:
Activities of daily living; social functioning; concentration,
persistence, or pace; and episodes of decompensation.  Listing
12.00(C); 20 C.F.R. §404.1520a(c)(3).  Each functional limitation
must be evaluated to determine the severity, taking into consid-
eration "all relevant and available clinical signs and laboratory
findings, the effects of [the] symptoms, and how [the claimant's]
functioning may be affected by factors including, but not limited
to, chronic mental disorders, structured settings, medication,
and other treatment."  20 C.F.R. §404.1520a(c)(1).  If the degree
of limitation is none or mild in the first three categories and
none in the fourth, the impairment is not severe.  20 C.F.R.
§404.1520a(d)(1).  Otherwise, the ALJ will proceed to determine

whether the claimant has met the criteria set forth by the
Listing for the specific mental impairment for which she was
diagnosed.  The "special technique" for rating the degree of
mental functioning is intended to aid an adjudicator in assessing
the level of severity of a claimant's mental impairment at Steps
two and three of the five-step sequential evaluation. 20 C.F.R.
§404.1520a(c)(3) (*citing* 20 C.F.R. Pt. 404, Subpt. P., app. 1,
§12.00(C)).

In ***David v. Barnhart,*** 446 F.Supp.2d 860, 877 (N.D. Ill.
2006), the ALJ did not list her findings as to the degree of
limitation in each of the functional areas.  However, the ALJ
adopted the evidence set forth in the Psychiatric Review Tech-
nique and the opinion of the ME that the plaintiff had moderate
difficulty maintaining concentration, persistence, and pace and
that insufficient evidence of repeated episodes of decompensation
existed.  ***David***, 446 F.Supp.2d at 877. The court found that the
ALJ properly considered the PRT and ME opinion and incorporated
the findings based on the Special Technique analysis in her
decision.  "The ALJ's explicit reliance on these assessments
obviates the need for the meticulous level of annotation Plain-
tiff demands." ***David***, 446 F.Supp.2d at 877 (*citing* ***Herron v.***
***Shalala***, 19 F.3d 329, 333 (7th Cir. 1994) (finding that as long
as the reviewing court is able to trace the path of reasons and

29

is satisfied that the ALJ considered the all importance evidence, the articulation standard is met).

In this case, the ALJ found that Dross-Swart's mental impairments were not severe.  The ALJ explicitly referred to exhibits within the record where analysis of the Paragraph B criteria, or special technique, were documented.  Specifically, the ALJ cited Exhibit 15F, which was a PRT performed on July 23, 2007, by state agency consultant Dr. Pressner, who concluded that the mental impairments that Dross-Swart had were not severe.  The PRT also found mild limitations with respect to restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.  There were no episodes of decompensation. The ALJ also cited to Exhibit 18F in a footnote, which was a case analysis performed by Dr. Unversaw.  The case analysis reviewed and affirmed the PRT issued by Dr. Pressner on July 23, 2007.

Although the ALJ did not elaborate on the Paragraph B criteria, the ALJ did incorporate the special technique when evaluating whether Dross-Swart had a severe impairment.  *See David*, 446 F.Supp.2d at 877 ("Though the ALJ did not specifically mention the special technique, she explicitly relied upon Exhibit 13F, i.e., a Psychiatric Review Technique, and the mental RFC determination made by the ME at the hearing.").  Dross-Swart has

30

not pointed to any medical evidence to suggest that her mental impairments were severe.  None of the treating, examining, or reviewing doctors noted marked limitations of daily living, social functioning, or maintaining concentration, persistence, or pace, nor did any note that she experienced episodes of decompensation.  Therefore, the ALJ did not err in application of the special technique analysis.

Second, Dross-Swart argues that the ALJ improperly dismissed her depression and bipolar disorder due to lack of mental health treatment.  Dross-Swart cites *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006), arguing that "mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment."  *Kangail*, 454 F.3d at 630 (*citing* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 187, 883 (4th ed. 1994); Frederick K. Goodwin & Kay Redfield Jamison, *Manic-Depressive Illness* 746-62 (1990); Annette Zygmunt, "Interventions to Improve Medication Adherence in Schizophrenia," 159 *Am. J. Psychiatry* 1653, 1662 (2002); Stephen Magura et al., "Adherence to Medication Regimens and Participation in Dual-Focus Self-Help Groups," 53 *Psychiatric Services* 310, 313 (2002)).

Although this may be true, the claimant bears the burden of producing medical records to establish her impairment. ***Denton v. Astrue***, 596 F.3d 419, 424 (7th Cir. 2010).  Dross-Swart has not provided any medical records showing that she was diagnosed with bipolar disorder. The only references to bipolar disorder were Dr. Kovachevich's notes indicating impressions of bipolar disorder on March 28, 2008, July 22, 2008, October 15, 2008, November 26, 2008, and January 27, 2009. However, Dr. Kovachevich did not diagnose Dross-Swart with bipolar disorder.  The ALJ went on to evaluate Dross-Swart's mental treatment records and noted that there was no evidence of any regular mental health treatment for bipolar disorder or depression.  The ALJ acknowledged that Dross-Swart was prescribed a psychotropic medication, but she explained that it was not clear from the record whether the medication was for Dross-Swart's mental impairments or for control of pain. The ALJ also noted that Dross-Swart visited a psychiatrist for mental health treatment.

The ALJ took all of Dross-Swart's treatment into consideration and explained that the record was devoid of any evidence of a severe mental impairment that affected her ability to perform basic work-related activities.  It is true that a mental impairment may prevent the claimant from seeking further treatment, however, the ALJ was not required to conclude that the claimant

32

suffered from a severe mental impairment because there was a lack
of medical evidence.  Rather, the ALJ relied on the conclusions
of the state agency psychologists who determined that Dross-Swart
did not have a severe mental impairment that significantly
affected her ability to perform basic work-related activities.
Because the only evidence of record concerning the severity of
Dross-Swart's mental impairments suggested that her condition was
not severe, the ALJ did not err by deciding accordingly.  The ALJ
could not consider evidence that was not before her, and Dross-
Swart did not provide medical evidence supporting her testimony
that she was diagnosed with bipolar disorder.  For this reason,
the ALJ did not err in finding Dross-Swart's mental impairment to
be non-severe.

Dross-Swart also attacks the ALJ's reliance on the state
agency consultant's opinion, arguing that the ALJ should have
assigned more weight to her GAF score of 55. GAF scores, defined
in Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of
Mental Disorders* 32-34 (Text Revision, 4th ed. 2000), are "useful
for planning treatment," and are measures of both severity of
symptoms *and* functional level.  Because the "final GAF rating
always reflects the worse of the two," the score does not reflect
the clinician's opinion of functional capacity. "[N]owhere do the
Social Security regulations or case law require an ALJ to deter-

33

mine the extent of an individual's disability based entirely on his GAF score." *Wilkins v. Barnhart,* 69 Fed.Appx. 775, 780 (7th Cir. 2003) (*citing* *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002)).

Next, Dross-Swart argues that the ALJ failed to take into consideration the combination or aggregate effect of her impairments because the ALJ separated her mental and physical symptoms. The ALJ is required to "consider the aggregate effect of this entire constellation of ailments — including those impairments that in isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). The ALJ cannot ignore entire lines of evidence or cherry pick the evidence that is favorable to a finding of non-disability. *Golembiewski*, 322 F.3d at 917. Rather, the ALJ must weigh all impairments, both severe and non-severe, and consider the effect these ailments have on the claimant's ability to function in their entirety.

Here, the ALJ found that Dross-Swart had a combination of severe impairments including headaches and neck pain secondary to a motor vehicle accident, possible optic neuropathy, a history of gallstones, chronic sinusitis, and obesity. In her explanation, the ALJ addressed Dross-Swart's mental impairments and stated that "the following residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph

B' mental function analysis.  In that regard, there is no basis for including any limitations with regard to the claimant's mental residual functional capacity."  (Tr. 18)  Although the ALJ may have concluded correctly that Dross-Swart's mental impairments were not severe, the ALJ was incorrect to exclude the effect of Dross-Swart's mild mental limitations from her analysis.

Although not severe, the mild limitations in activities of daily living, social functioning, and concentration, persistence and pace caused by her diagnoses of MDD, Adjustment Disorder with mixed anxiety, and depression, that the ALJ adopted in her opinion should have been incorporated into the ALJ's RFC analysis. *See* 20 C.F.R. §1545(a)(1)("We will assess your residual functional capacity based on *all* the relevant evidence in your case record.") (emphasis added).  Therefore, The ALJ's dismissal of these limitations in calculating the RFC, did not build a "logical bridge from the evidence to [her] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." **Scott**, 297 F.3d at 595.  This warrants **REMAND** to the Social Security Administration to assess the RFC based on *all* impairments, not just severe impairments.

35

Next, Dross-Swart argues that the ALJ rendered an improper credibility determination.  This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record.  *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.").  The ALJ's "unique position to observe a witness" entitles his opinion to great deference.  *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference.  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be

accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "history, the signs and laboratory findings, and statements from [the claimant], [the claimant's] treating or nontreating source, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); *Schmidt*, 395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also Indoranto v.*

*Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Carradine v. Barn-hart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a signifi-
> cant factor of his or her alleged inability
> to work, the ALJ must obtain detailed de-
> scriptions of the claimant's daily activities
> by directing specific inquiries about the
> pain and its effects to the claimant. She
> must investigate all avenues presented that
> relate to pain, including claimant's prior
> work record, information and observations by
> treating physicians, examining physicians,
> and third parties. Factors that must be
> considered include the nature and intensity
> of the claimant's pain, precipitation and
> aggravating factors, dosage and effectiveness
> of any pain medications, other treatment for
> relief of pain, functional restrictions, and
> the claimant's daily activities. (internal
> citations omitted).
>
> *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.
> 1994)

*See also* *Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ has discounted the claimant's description of pain because it was inconsistent with the objective medical evidence, she must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently

specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, at *2. *See Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).  She must "build an accurate and logical bridge from the evidence to her conclusion." *Zurawski*, 245 F.3d at 887 (*quoting Clifford*, 227 F.3d at 872). When the evidence conflicted regarding the extent of the claim-ant's limitations, the ALJ could not rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ rejected.  *See Zurawski*, 245 F.3d at 888 (*quoting Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Dross-Swart argues that the ALJ's credibility finding is flawed because the ALJ used boilerplate language, improperly rejected her subjective complaints of pain by pointing to the lack of corroborating objective medical evidence, failed to consider the reasons for her lack of treatment, and failed to consider the side-effects of her medications.

The ALJ began her credibility finding with the boilerplate statement that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  Although this Circuit disfavors boilerplate language, an ALJ's decision will not be overturned merely because it contains a boilerplate statement. The important assessment is whether the ALJ adequately supported the boilerplate statement and built a logical bridge to her conclusion.

The ALJ discussed the course of treatment Dross-Swart received, including a consulting ophthalmologist, consulting neurologist, CT scans of the head and brain essentially showing sinus problems, negative x-rays, and mild or moderate degenerative changes in the cervical spine.  The ALJ did not totally discount Dross-Swart's testimony, but she stated that the "objective medical evidence does not fully corroborate the claimant's description of her symptoms, the severity of her pain and the degrees of incapacitation she alleges."  (Tr. 23)  Moreover, the ALJ found Dross-Swart's testimony somewhat credible and incorporated the following into the RFC: compromised ability to use her left hand, avoidance of exacerbation of symptoms related to her

migraine headaches, and avoidance of concentrated exposure to heights and moving machinery based on the suggestion of vertigo. Because the ALJ proceeded to articulate reasons for her decision, the use of boilerplate language was not improper.

Next, Dross-Swart argues that the ALJ dismissed her pain allegations due to lack of medical treatment. An ALJ may not draw inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering an explanation. *See* SSR 96-7p. Explanations provided by an individual, such as inability to afford treatment, may provide insight into the individual's credibility. SSR 96-7p.

In her opinion, the ALJ stated on multiple occasions that Dross-Swart failed to continue or to obtain treatment. The ALJ explained that Dross-Swart did not follow up with several physicians and did not obtain the recommended testing. Although Dross-Swart testified at the hearing that she was having difficulty affording medication, the ALJ did not acknowledge this testimony and take it into account when rendering her opinion. Had the ALJ considered this testimony, it may have provided insight into why Dross-Swart did not continue treatment or obtain further treatment. Although the ALJ also noted that the existing records did not recommend an aggressive treatment plan, the court

41

cannot speculate on the degree that Dross-Swart's lack of treat-
ment played in the ALJ's final conclusion.  For this reason,
Dross-Swart's claim is **REMANDED** on this issue, and the ALJ must
consider the effect of Dross-Swart's financial problems on her
ability to obtain or continue medical treatment.

As a final challenge to the ALJ's credibility finding,
Dross-Swart argues that the ALJ failed to consider the side
effects of her medications. In her opinion, the ALJ listed the
medications Dross-Swart was taking, but she did not provide any
discussion of the side effects. In her brief, Dross-Swart points
to the side effects her medications were capable of producing,
however, she only cited to one instance where she testified about
the side effects she actually experienced.  Dross-Stewart com-
plained that she slept for two or three hours after taking
Ambien.

When considering Dross-Swart's daily activities, the ALJ
noted that Dross-Swart testified that she took daily naps, but
she discounted this activity, finding there was an absence of any
supporting objective medical evidence.  The record does not
reflect that the ALJ considered that the naps might have been the
result of the side effects of Ambien.  Therefore, the ALJ's
conclusion that no objective medical evidence supported this
testimony was mistaken. The Ambien may have been the cause of

Dross-Swart's drowsiness.  Because the ALJ must give weight to
the side effects produced by medications the claimant is taking
when assessing credibility, on remand, the ALJ must consider the
side effects Dross-Swart experienced from Ambien, and to what
extent, if any, the side effects had on her daily activities and
RFC.  SSR 96-7p (explaining that the ALJ must consider the type,
dosage, effectiveness, and side effects of any medication the
claimant takes or has taken to alleviate pain when assessing
credibility).

Finally, Dross-Swart argues that the ALJ rendered improper
Step 4 and 5 determinations.  Dross-Swart raises the following
arguments: at step four, the ALJ failed to state whether or not
she was finding Dross-Swart capable of working the position of
teacher's aid as it was generally or actually performed and that
the teacher's aid position should not have been considered past
relevant work.  Further, at step 5, the ALJ failed to ascertain
inconsistencies between the DOT and the VE testimony; failed to
incorporate all limitations into hypotheticals to the VE; failed
to take into consideration the impact of Dross-Swart's unpredict-
able, but severe headaches on her ability to sustain employment;
and failed to account for Dross-Swart's diagnosed bipolar disor-
der.

At Step 4, "work experience applies when it was done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity."  20 C.F.R. §404.1565(a).  Here, the ALJ included the teacher's assistant position as past relevant work experience although Dross-Swart did not perform the job long enough for it to be considered substantial gainful activity.  The Commissioner concedes this argument in his brief. Although the opinion should reflect that Dross-Swart was not capable of performing past relevant work, the ALJ determined that there were a number of jobs that Dross-Swart was capable of doing, including parking lot attendant (2,000 jobs) and information clerk (8,600 jobs). Therefore, the fact that she had no past relevant work did not bear on the outcome of the ALJ's decision.

At step 5, Dross-Swart first argues that the ALJ failed to incorporate her findings that Dross-Swart was limited to occa-sional handling and fingering with the non-dominant left hand into her hypothetical questions posed to the VE.  This argument is without merit as the ALJ specifically asked the VE whether the limitations given by Dross-Swart's attorney would be consistent with occasional handling and fingering with the left upper extremity.  (Tr. 75-76)

44

Dross-Swart also challenges the Step 5 determination by arguing that the VE's testimony conflicts with the DOT and that the ALJ did not obtain a reasonable explanation to resolve the apparent conflict.  The Commissioner bears the burden at step five of establishing that the claimant can perform other work that "exists in significant numbers in the national economy." 20 C.F.R. §404.1560(c)(2); *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  A VE's testimony can satisfy this burden only if that testimony is reliable.  *Britton*, 521 F.3d at 803; *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2001). "A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton*, 521 F.3d at 803.

SSR 00-4p requires:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and if the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p

The regulations allow the ALJ to rely on either the VE or the DOT when making a determination regarding available work for the claimant. *See* 20 C.F.R. §404.1566(d), (e). But if the VE's testimony and the DOT conflict, the ALJ first must obtain a reasonable explanation for the conflict. ***Prochaska***, 454 F.3d at 735.  Furthermore, before the ALJ can rely on the VE's testimony as substantial evidence, he must make the SSR 00-4p inquiry as to consistency with the DOT and elicit a response as to any discrepancies. ***Prochaska***, 454 F.3d at 735 (*citing* ***Haddock v. Apfel***, 196 F.3d 1084, 1087 (10th Cir. 1999)).  SSR 00-4p places the burden of making the DOT inquiry on the ALJ, not the claimant. ***Prochaska***, 454 F.3d at 735.

An ALJ may "accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT's authors." ***Donahue v. Barnhart,*** 279 F.3d 441, 446 (7th Cir. 2002). The ALJ also may accept the VE's conflicting testimony when based on information in "other reliable publications." SSR 00-4p; ***Overman v. Astrue***, 546 F.3d 456, 464 (7th Cir. 2008). "The ALJ's reliance upon the VE's testimony is not reversible error because an ALJ may rely upon a VE's 'bottom-line' or 'purely conclusional' testimony, so long as data and reasoning underlying the opinion are 'available

46

on demand.'" *Overman*, 546 F.3d at 464 (*citing Donahue*, 279 F.3d at 446). *See also Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) (citing same).

Here, the ALJ inquired whether the positions were consistent with the DOT. The VE confirmed that they were, and Dross-Swart's counsel did not identify any inconsistencies at the time of the hearing. Dross-Swart argues that it was apparent that the positions of parking lot attendant, information clerk, and teacher's aid required exposure to a noise intensity level higher than low.

The Seventh Circuit previously demanded that the claimant identify any discrepancies at the hearing and found that conflicts raised only after the hearing were untimely. *Donahue*, 279 F.3d at 447. The Seventh Circuit reconsidered this standard in *Prochaska*, 454 F.3d at 735, and determined that the ALJ has an affirmative duty to resolve any conflicts. The claimant is no longer required to raise apparent inconsistencies between the VE's testimony and the DOT at the hearing. *Prochaska*, 454 F.3d at 735. Rather, the claimant may raise a conflict between the VE's testimony and the DOT for the first time on appeal if she can show that the conflict was so obvious that the ALJ should have identified it without assistance. *Overman*, 546 F.3d at 463.

The ALJ concluded that the Dross-Swart could perform the positions of teacher's aid, parking lot attendant, and informa-

47

tion clerk.  According to the DOT, the teacher's aid and informa-
tion clerk positions required exposure to a moderate noise level,
and the parking lot attendant exposed the individual to loud
noise.  Dross-Swart argues that these descriptions were inconsis-
tent with the ALJ's RFC determination, which stated that Dross-
Swart must avoid moderate exposure to noise.

The Commissioner's only defense is that Dross-Swart's
objection is untimely.  However, as explained above, Dross-Swart
may raise this conflict on appeal.  There is no ambiguity in the
ALJ's RFC determination or the DOT's description of the identi-
fied positions.  Rather, the conflict is apparent from the very
terms of the positions' descriptions and the ALJ's RFC determina-
tion.  The ALJ did not inquire about the inconsistencies, and
therefore, did not fulfill her affirmative duty to resolve the
apparent conflict between her RFC finding and the DOT descrip-
tions.  The ALJ must resolve this discrepancy on remand.

Dross-Swart also complains that the positions the VE identi-
fied, as defined by the DOT, were inconsistent with the RFC
limitation to occasionally finger and handle with the non-domi-
nant, left upper extremity.  Specifically, the DOT defines the
positions of teacher's aid and parking lot attendant as requiring
a Level 3 for manual dexterity, meaning the ability to move hands
easily and skillfully. These positions also require frequent

48

handling, and parking lot attendant requires frequent fingering. Again, the discrepancy is apparent from the terms of the description and the RFC finding.  The ALJ did not make any effort to inquire into the inconsistency and must address this on remand.

Finally, Dross-Swart argues that the ALJ failed to take into consideration the impact of her unpredictable but severe headaches, on her ability to sustain employment.  Dross-Swart argues that the ALJ should have incorporated the VE's negative response to her attorney's inquiry about the availability of jobs for someone who had headaches of such a severity that the person would cry and would have to be in a dark room for a whole day twice a week.  However, the ALJ did not find Dross-Swart's headaches to be as debilitating as described.  The ALJ acknowledged that Dross-Swart experienced headaches, but she discounted the severity.  The court did not remand the ALJ's credibility determination to reassess the severity of Dross-Swart's headaches.  Rather, the court determined that the ALJ's conclusions were well supported.  The ALJ accounted for Dross-Swart's headaches by restricting her from exposure to heights, moving machinery, noise, and bright lights, and included these limitations in the hypotheticals she posed to the VE.  Because the ALJ incorporated her well supported RFC findings into the hypotheticals she posed to the ALJ, she did not err in relying on the VE's testi-

49

mony and was not required to incorporate the VE's response to a restriction she did not include in her assessment.

_____

Based on the foregoing reasons, the decision of the Commissioner of Social Security is **REMANDED** for further proceedings consistent with this Order.

ENTERED this 30th day of May, 2012

                    s/ ANDREW P. RODOVICH
                       United States Magistrate Judge